IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| AUTUMN GARENS,<br><br>   Plaintiff,<br><br> vs.<br><br>COMMISSIONER OF SOCIAL<br>SECURITY ADMINISTRATION,<br><br>   Defendant. | CASE NO. 5:22-cv-00783-JRA<br><br>DISTRICT JUDGE<br>JOHN R. ADAMS<br><br>MAGISTRATE JUDGE<br>JAMES E. GRIMES JR.<br><br>REPORT &<br>RECOMMENDATION |

   Plaintiff Autumn Garens filed a complaint against the Commissioner of Social Security seeking judicial review of its decision denying disability insurance benefits and supplemental security income. This Court has jurisdiction pursuant to 42 U.S.C. §§ 405(g) and 1383(c). The matter has been referred to a Magistrate Judge under Local Rule 72.2(b)(1) for the preparation of a Report and Recommendation. Following review, and for the reasons stated below, I recommend the District Court affirm the Commissioner's decision.

## Procedural background

   In October 2020, Garens filed an application for supplemental security income alleging a disability onset date of February 25, 2020, [1] Tr. 270, and claiming that she was disabled due to back problems, asthma, schizoaffective

---

[1]   "Once a finding of disability is made, the ALJ must determine the onset date of the disability." *McClanahan v. Comm'r of Soc. Sec.*, 193 F. App'x 422, 425 (6th Cir. 2006).

disorder, and post-traumatic stress disorder (PTSD), Tr. 189. The Commissioner denied Garens's applications at the initial level and upon reconsideration. Tr. 188–205, 208–12, 216–18. Garens requested a hearing before an ALJ. Tr. 219–21.

In February 2021, ALJ Michael Schmitz held a hearing at which Garens and vocational expert William Kiger testified. Tr. 110–42. Two weeks later, the ALJ issued a written decision finding that Garens was not disabled. Tr. 75–105. In March 2021, the ALJ's decision became final when the Appeals Council declined further review. Tr. 1–4, *see* 20 C.F.R. § 404.981. Garens filed this action in September 2022. Doc. 1.

## Factual background

### *Personal and vocational evidence*

Garens was born in November 1988 and was 31 years old on the onset date of her alleged disability. Tr. 114. She has a limited education and no past work experience. Tr. 17, 103, 122, 293.

### *Medical evidence*[2]

From November 2020 through January 2021, Garens attended biweekly psychotherapy sessions with Counselor Lance Darling-Mellott, L.P.C., and

---

[2]     The recitation of medical evidence here is not intended to be exhaustive. Because the instant appeal is limited to the evaluation and interpretation of Garens's mental health impairment, so too are the facts.

monthly medication management appointments with Katelyn Stenger, C.N.P. Tr. 870–908, 1131–59, 1163–1238, 1263–65, 1271–74, 1278–93, 1371–91.

In December 2019, Garens had an appointment with Nurse Stenger. Tr. 409–11. Nurse Stenger found that Garens was paranoid with a mildly elevated mood and mildly rapid speech. Tr. 410. Garens reported that she was having panic attacks, wasn't sleeping well, and felt increasingly paranoid, restless, and tense. *Id*. She indicated that her high level of anxiety was giving her hot flashes, making her sweat, and compelling her to avoid going places. *Id*. She described an anxiety-induced panic attack during which she started slurring her words and, as a result, became convinced that she was having a stroke. *Id*.

In January 2020, Garens had an appointment with Nurse Stenger. Tr. 893. She reported that she felt stressed and described a recent trauma trigger that had given her nightmares and led her to seclude herself. *Id*. Nurse Stenger found that Garens was polite and cooperative with appropriate and coherent speech; a logical, linear, and goal-directed thought process; good judgment, insight, attention span, and concentration; and an intact memory. Tr. 894. Nurse Stenger noted that Garens had an anxious and depressed mood, that her thought content was paranoid, and that she admitted having passive thoughts of death. *Id*. Nurse Stenger started Garens on Seroquel and instructed her to continue taking her other medications, including Topamax, Risperdal, Zoloft, Ambien, Trazodone, and Ativan, without adjustment. *Id*.

In February 2020, one day before the alleged onset date of Garens's disability, Garens saw Counselor Darling-Mellott for therapy. Tr. 1212. She reported an escalation in her panic attacks and difficulty sleeping that she couldn't explain. Tr. 1212.

As Garens continued to see Counselor Darling-Mellott in March and April 2020, she expressed increasing concern over the coronavirus pandemic. Tr. 1214, 1216.

In April 2020, during a telemedicine appointment, Nurse Stenger observed that Garens had an anxious mood. Tr. 899. Garens indicated that her anxiety had been high since the pandemic began. *Id*. She reported that Seroquel improved her mood swings and sleep but that she had run out of the medication early. Tr. 897. Garens reported having mild auditory and visual hallucinations, Tr. 898, describing her hallucinations as "okay." Tr. 897.  She also reported racing thoughts, especially at night, and nightmares, though typically only after watching a scary movie. Tr. 898. Nurse Stenger increased Garens's dosage of Seroquel and discontinued her use of Ambien. Tr. 899.

Less than a week later, Garens saw Counselor Darling-Mellott and reported sleeping a lot, and much better, since Nurse Stenger adjusted her medication. Tr. 1220. She told him that Ativan improved her anxiety though sometimes she had panic attacks without a discernable trigger. Tr. 1218.

In May 2020, during a telemedicine appointment, Nurse Stenger observed that Garens was anxious and "a little irritable." Tr. 902. Garens

4

reported that she had a lot of anxiety and was sleeping too much. Tr. 901. She asked Nurse Stenger to put her back on Ambien instead of Seroquel. Tr. 904. Nurse Stenger obliged. *Id*.

In June 2020, during a telemedicine appointment with Nurse Stenger, Garens said that she was "more stable than she has ever been." Tr. 905. Garens reported having auditory hallucinations and paranoia. Tr. 905. Nurse Stenger continued Garens's medications without adjustment. Tr. 907.

Thereafter and for the next six months, Garens experienced a marked decompensation as her psychiatric symptoms—anxiety, hallucinations, stress, mania, cutting, insomnia—intensified. Tr. 1154, 1226, 1233, 1264, 1278. She attributed the uptick to several stressors in her life: the sudden death of her child's father in a car accident; the death of a close family member at whose wake Garens felt "manic and unwell;" concern for the health of her partner, who had apparently had several strokes unbeknownst to either of them; and the relationship she had with one of her daughters, Garens having relinquished custodial rights during this time period. Tr. 1154, 1226, 1233, 1264, 1278.

In September 2020, during a telemedicine appointment with Nurse Stenger, Garens said that despite being out of state for a funeral, she "really" needed to talk. Tr. 1264, 1271. Nurse Stenger observed that Garens was "calm at the beginning of the call" but began to sound "depressed and anxious" as she discussed her life. Tr. 1272. Garens admitted that she "wasn't doing very well"

after multiple recent deaths in her family. Tr. 1271. She said she had been having mood swings, hallucinations, anxiety, and nightmares. *Id*. She described having "bad thoughts" that she wasn't able to control, such as "wanting to die right along with her loved ones." *Id*. Nurse Stenger increased Garens's dosage of Ativan and Cogentin, started her on Thorazine, and directed her to continue taking her other medications without adjustment. Tr. 1272. Nurse Stenger noted that during their next appointment, she would suggest Garens begin attending intensive outpatient programming at a local hospital. Tr. 1272.

In October 2020, Garens saw Counselor Darling-Mellott for therapy. Tr. 1278. She said she felt hopeless and admitted to cutting herself since she had signed away custody of her daughter. Tr. 1278. Garens said that she was considering checking herself into a local mental health hospital but was reluctant to leave her partner even temporarily because of his ongoing health issues. *Id*.

In November 2020, Garens had a telemedicine appointment with Nurse Stenger. Tr. 1371. Nurse Stenger documented Garens's diagnoses as bipolar type schizoaffective disorder; chronic PTSD; major depressive disorder that was recurrent and severe with psychotic symptoms; insomnia, anxiety disorder; and impulse disorder. Tr. 1373–74. Garens said that she was "kinda okay" and indicated that she felt very depressed and paranoid, heard voices "pretty much" "every day all day," was having nightmares, and "wish[ed] all

6

the chaos would stop." Tr. 1371, 1373. She said that the voices she was hearing had been with her "off and on for a long time" and ascribed their recent return and constancy to her stress level. Tr. 1371. Garens also acknowledged that she had started to cut herself recently. *Id*. Nurse Stenger evaluated Garens's wounds and recommended Garens seek medical attention for some of the deeper cuts that were still healing. Tr. 1372. Nurse Stenger also recommended Garens participate in the local intensive outpatient program. Tr. 1372. Garens said she was not interested at the time and was too overwhelmed with her existing obligations. *Id*. Garens mentioned one such obligation, a parole requirement to complete a certain number of community service hours, as a particularly challenging task. Tr. 1371–72.

Around the same time, Garens saw Counselor Darling-Mellott for therapy. Tr. 1282. They also discussed the extent to which Garens was struggling to meet her community service requirements since she was "not doing well around other people." Tr. 1282.

In December 2020, Garens had a telemedicine appointment with Nurse Stenger. Tr. 1378. Nurse Stenger observed that Garens was depressed and anxious, briefly tearful and briefly angry, and paranoid with auditory hallucinations and vague suicidal ideation. Tr. 1381. Garens indicated that over the Thanksgiving holiday, her dog had accidentally ingested some psychiatric medications, including her Risperdal, and that, without it, she was having horrific dreams, hearing voices, crying, and "not doing well at all." Tr.

7

1378. Garens reported that the Risperdal improved her hallucinations. Tr. 1379. They discussed Garens's community service requirements and agreed that she could reasonably handle one to two hours of service per week. Tr. 1379. Nurse Stenger indicated that she would memorialize this weekly goal in a letter and submit it to the court on Garens's behalf. Tr. 1379, 1875.

Nurse Stenger submitted her letter as promised in December 2020, writing that she had treated Garens since September 2018. Tr. 1875. She indicated that Garens regularly experienced "debilitating anxiety," auditory hallucinations, paranoia, nightmares, difficulty sleeping, depression, and mood swings. Tr. 1875. She requested that the court extend the deadline by which Garens was required to complete the hours and opined that Garens would suffer considerable psychiatric distress if she were required to perform more than one to two hours of community service each week. *Id*.

In a January 2021 therapy session with Counselor Darling-Mellott, Garens reported that she was overwhelmed and described her home as a hostile group environment full of people who regularly yelled at her. Tr. 1290. She told him that she felt unstable and planned to ask Nurse Stenger adjust her medications at her next appointment. Tr. 1291.

A few days later, Garens had a telemedicine appointment with Nurse Stenger, who observed that Garens's paranoia was "problematic," her moods swung from depression to anxiety to irritability, and that she continued to report auditory and visual hallucinations. Tr. 1386. Nurse Stenger found that

8

Garens was cooperative and polite with appropriate speech, normal thought processes, intact associations and memory, and good judgment, insight, knowledge, attention span, and concentration. *Id.* Garens updated Nurse Stenger that she no longer had any court-mandated community service obligations and expressed relief at that outcome. Tr. 1385. Garens described herself as unstable and said that she'd felt that way for quite some time. Tr. 1385, 1386. Nurse Stenger noted:

> [Garens] has a lot of mood swings, hallucinations, [and] bad dreams. She's been waking up in the middle of the night with anxiety and her body is going numb with the anxiety. Some nights she doesn't remember what she dreams about and some nights she does. She doesn't want to remember what the dreams are about. The nights she remembers what she dreams about, she wakes up panicking…. She's had hallucinations of people being hung up by meat hooks and dumping gasoline on people and setting them on fire. She sees these images which involve random people she knows. She sees [the deceased father of her daughter] standing and walking. She swears he opened the door for her at her old [apartment] but there wasn't anyone there. She keeps hearing kids asking her to help. She doesn't know what they're asking for help with. She hears her name over and over and she hears babies crying. She states that maybe she needs to go to the psych ward. She's not sure. She's 'overstressed.'

Tr. 1384–85. Nurse Stenger then learned that since December 2019—for over a year—Garens had been taking one-third less Risperdal than Nurse Stenger had intended for her to take. Tr. 1384.

In January 2021, Garens saw Counselor Darling-Mellott for therapy. Tr. 1291. Garens reported that the adjustment to her medication was helping to control her delusions. Tr. 1292.

9

*State agency and other medical opinion evidence*[3]

In January 2020—one month before Garens's alleged disability onset date—Counselor Darling-Mellott completed a Mental Impairment Questionnaire and listed Garens's diagnoses as schizoaffective disorder, PTSD, and borderline personality disorder. Tr. 811. He opined that Garens's conditions rendered her completely unable to function independently outside of her home. Tr. 813. He described side-effects of her medications including drowsiness and fatigue, and categorized her PTSD symptoms as severe. Tr. 811. He estimated that Garens would be absent from work more than four days per month due to her mental health impairments and treatment. Tr. 813.

In August 2020, state agency psychologist Jennifer Swain, Psy.D., reviewed the medical evidence and determined that Garens had no limitations in understanding, remembering, or applying information and moderate limitations in interacting with others, concentrating, persisting, or maintaining pace, and adapting or managing herself. Tr. 191. Dr. Swain found that Garens could work in a setting with infrequent changes that was not fast-paced and did not require strict time or productions demands and that she

---

[3]     When a claimant applies for disability benefits, the state agency creates a record. The record includes the claimant's medical evidence. A state agency disability examiner and a state agency physician or psychologist review the claimant's record and determine whether and to what extent the claimant's condition affects his or her ability to work. If the state agency denies the claimant's application, the claimant can ask for reconsideration. On reconsideration, the state agency updates the record and a second disability examiner and doctor review the file and make a new determination. *See, e.g.*, 20 C.F.R. § 404.1615.

could relate superficially with coworkers and supervisors, and minimally with the public. Tr. 193–94.

In September 2020, during reconsideration, state agency psychologist Robyn Murry-Hoffman, Psy.D., affirmed Dr. Swain's findings. Tr. 201–03.

*Testimonial evidence*

In February 2021, Garens and vocational expert William Kiger testified during the ALJ hearing. Tr. 110–42. Garens lived in a group home until she was 18 years old and "didn't really go to school." Tr. 122. Intermittently for the past twelve years, Garens has resided at the home of her friend Leslie. Tr. 120–21. Including Garens, there are eleven people currently living at Leslie's house. *Id*. It is "really chaotic" at times and Garens has had conflicts with some of her roommates. Tr. 121.

Paranoia makes Garens afraid of people. Tr. 122. She "doesn't "do big crowds." *Id*.  She feels like "people talk about [her] and watch [her] and [she] get[s] … just really super paranoid." *Id*. Sometimes, she is even paranoid at home. Tr. 132. Her thoughts race "all the time" and her mind is "always going 100 miles an hour." Tr. 133. She has trouble focusing and takes breaks when she reads or watches television. *Id*.

Anxiety gives Garens panic attacks that numb her body and brain and can last "anywhere from 10 to 20 minutes." Tr. 128. Occasionally, her panic attacks mimic a stroke or cardiac arrest so convincingly that she believes she needs an ambulance. *Id*.

11

Because of her PTSD, Garens experiences "really bad nightmares" "almost every night." Tr. 126.

Schizoaffective disorder gives Garens auditory, visual, and olfactory hallucinations "very frequently." Tr. 126. She see things, smells things, and hears people talking. Tr. 131.[4] Sometimes she responds. *Id.*

Major depressive disorder makes Garens very emotional. Tr. 127–28. She has crying spells almost every day. Tr. 128. She stabbed herself in the stomach two years ago and was admitted to a psychiatric hospital. Tr. 127.

Garens angers easily and is "very irritable." Tr. 133. One minute, she'll be fine and the next minute, she'll "flip out" and "scream" "for no reason." Tr. 134. She recently screamed at a stranger in a Drug Mart because "he got too close to her." *Id.* She felt bad for screaming at him but thinks that she couldn't help it. *Id.* She isn't certain, but she felt like she couldn't help it. *Id.*

Garens has a therapy dog to help her cope. Tr. 128. Garens takes daily care of the dog—feeding her, playing with her, and walking her in the yard. *Id.* Garens's other daily activities are drawing, reading books, watching television, praying, and spending time with friends. Tr. 129–30. Due to her anxiety,

---

[4] During her November 2020 appointment with Nurse Stenger, Garens reported "hearing voices pretty much every[,] all day" and said that the voices were "sometimes … jumbled." Tr. 1371.

Garens doesn't drive. Tr. 121. Sometimes, she shops for her own groceries. *Id*.
She manages her own medications by setting alarms. Tr. 129.[5]

After Garens, vocational expert William Kiger testified. Tr. 135–39. The
ALJ asked Kiger whether a hypothetical individual the same age as Garens
with the same education level and work history would be able to perform
unskilled work with a light of exertion if that individual had the limitations
assessed in Garens's RFC, discussed below. Tr. 136–37. Kiger affirmed that
such an individual could perform unskilled work with a light level of exertion
and listed representative positions such as a marker, routing clerk, or collator
operator. Tr. 138. Kiger testified that such an individual would be precluded
from all work if his or her social interactions were reduced to isolation except
for occasional interaction with a supervisor, if his or her off-task time exceeded
15 percent, and if he or she would be absent more than one day per month. *Id*.

### The ALJ's decision

The ALJ made the following findings of fact and conclusions of law:

> 1.  Garens has not engaged in substantial gainful activity
> since February 25, 2020, the date on which her application
> was filed. 20 CFR 416.971 *et seq.*
>
> 2.  Garens has the following severe impairments:
> degenerative disc disease (DDD) of the lumbar spine with
> sciatica, asthma, migraines, and schizoaffective disorder
> (bipolar type), depressive disorder, anxiety disorder,
> borderline personality disorder and impulse control

---

[5]     In a function report that Garens completed in July 2020, she said that
she occasionally cooks and regularly prepares simple meals such as frozen
dinners and sandwiches. Tr. 309

disorders, and posttraumatic stress disorder (PTSD). 20 CFR 416.920(c).

3. Garens does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. 20 CFR 416.920(d), 416.925, and 416.926.

4. Garens has the residual functional capacity to perform light work, as defined in 20 CFR 416.967(b), except that she is further limited in the following non-exertional respects:

– Can never climb ladders, ropes, or scaffolds but can occasionally climb ramps and stairs, and can occasionally stoop, crouch, kneel, and crawl;

– Must avoid concentrated exposure to loud noise, to bright lights (meaning, any brighter than a typical office setting), and to pulmonary irritants such as fumes, odors, dusts, gases, and poor ventilation; and must avoid all exposure to hazards such as unprotected heights, moving mechanical parts, and commercial driving; and

– Can perform simple, routine, and repetitive tasks and can make only simple work-related decisions, but cannot perform tasks that require a high production-rate pace such as assembly line work, and should not be responsible for the safety or welfare of others; can interact on an occasional basis with supervisors and with a small group of familiar coworkers, but with no more than incidental interaction with the general public, and is limited to superficial contact meaning no sales, arbitration, negotiation, conflict resolution or confrontation, no group or tandem or collaborative tasks, and no management, direction or persuasion of others; and can respond appropriately to occasional change in a routine work setting, as long as any such changes are easily explained and/or demonstrated in advance of gradual implementation.

5. Garens has no past relevant work. 20 CFR 416.965.

6. Garens was born in November 1988 and was 31 years old, which is defined as a younger individual age 18-49, on the date the application was filed. 20 CFR 416.963.

7. Garens has a limited education. 20 CFR 416.964.

8. Transferability of job skills is not an issue because Garens does not have past relevant work. 20 CFR 416.968.

9. Considering Garens's age, education, lack of work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the Garens can perform (20 CFR 416.969 and 416.969a).

10. Garens has not been under a disability, as defined in the Social Security Act, since February 25, 2020, the date on which the application was filed (20 CFR 416.920(g)).

Tr. 80–105.

## Standard for disability

Eligibility for benefit payments depends on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. § 1382c(a)(3)(A).

An ALJ is required to follow a five-step sequential analysis to make a disability determination:

1. Is the claimant engaged in substantial gainful activity? If so, the claimant is not disabled.

2. Does the claimant have a medically determinable impairment, or a combination of impairments, that is "severe"? If not, the claimant is not disabled.

3. Does the claimant's impairment meet or equal one of the listed impairments and meet the duration requirement? If so, the claimant is disabled. If not, the ALJ proceeds to the next step.

4. What is the claimant's residual functional capacity, and can the claimant perform past relevant work? If so, the claimant is not disabled. If not, the ALJ proceeds to the next step.

5. Can the claimant do any other work considering the claimant's residual functional capacity, age, education, and work experience? If so, the claimant is not disabled. If not, the claimant is disabled.

20 C.F.R. §§ 404.1520, 416.920. Under this sequential analysis, the claimant has the burden of proof at steps one through four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at step five to establish whether the claimant has the vocational factors to perform available work in the national economy. *Id.* If a claimant satisfies each element of the analysis and meets the duration requirements, the claimant is determined to be disabled. *Id.*

## Standard of review

A reviewing court must affirm the Commissioner's conclusions unless it determines "that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters*, 127 F.3d at 528. "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant

evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.,* 889 F.2d 679, 681 (6th Cir. 1989)). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (quoting 42 U.S.C. § 405(g)).

A court may not try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility. *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). Even if substantial evidence or a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is so because there is a "'zone of choice within which'" the Commissioner can act, without fear of court "'interference.'" *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (quoting *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

## Discussion

Garens asserts that "[t]he ALJ's finding that [she] retained a residual functional capacity for light, unskilled work was not supported by substantial evidence." Doc. 7, at 8. Unfortunately, Garens never explains why this might be so.

17

Instead, after reciting applicable standards, *id*. at 8–10, Garens briefly reviews evidence from Nurse Stenger and Counselor Darling-Mellott and asserts that, after years spent treating Garens, their "observations … about the severity of [Garens's] limitations are consistent with each other," *id*. at 10. But Garens never so much as hints at why the ALJ's decision is *not* supported by substantial evidence. *See id*. at 10–11.

And this omission matters because "so long as substantial evidence supports the conclusion reached by the ALJ," it doesn't matter if substantial evidence also supports a claimant's position. *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997). So, whether—as Garens says—"[s]ubstantial evidence supports the conclusion that [Garens] ought to have been found to be disabled," Doc. 7, at 11, is irrelevant unless she shows that substantial does not support the ALJ's decision, *see Warner v. Comm'r of Soc. Sec*., 375 F.3d 387, 390 (6th Cir. 2004). Garens has thus forfeited any argument that the ALJ's decision is unsupported by substantial evidence. *See McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones."). Since this is the only argument of consequence in this case, the Court should uphold the Commissioner's decision.

Further, it's not clear where Garens believes the ALJ erred in his sequential analysis. She asserts that "[s]ubstantial evidence supports the conclusion that Plaintiff ought to have been found to be disabled at the fifth step of the sequential evaluation process, if not at the third." Doc. 7, at 11. But the abbreviated heart of her argument is about opinion evidence, which seems to relate to her RFC.[6] *See id*. at 10–11. Again, however, Garens doesn't say what's wrong with the ALJ's RFC determination. Rather, she appears to argue about what's right about her perspective.

But even taking Garens at her word and assuming that she is challenging the ALJ's step-five analysis, and further assuming that she preserved that argument, which she hasn't, "at step five, the ALJ considers the claimant's RFC in combination with other factors and asks whether the claimant "can make an adjustment to other work."[7] 20 C.F.R. § 416.920(a)(4)(v), (g)(1). If the ALJ determines that the claimant "can make an adjustment to other work," the ALJ "will find that [the claimant is] not disabled." 20 C.F.R. § 416.920(a)(4)(v); *see id*. at 416.920(g)(1).

Here, the ALJ cited the correct regulation and stated that at step five he was required to "determine whether the claimant is able to do any other

---

[6]     An RFC determination is not a *step* in the agency's five-step evaluation; rather it is a finding that is used at step four and step five. *See* 20 C.F.R. § 404.1545(a)(5).

[7]     Because we are already far down the rabbit hole of dispatching arguments that Garens hasn't preserved, I decline to discuss Garens's undeveloped argument that the ALJ erred at step three. *See* Doc. 7, at 11.

work considering her residual functional capacity, age, education, and work experience." Tr. 80. He then determined that with some noted limitations, Garens "has the residual functional capacity to perform light work." Tr. 88–89. Over the following the 15 pages, the ALJ reviewed the evidence—Garens's written statements and testimony, reports of her medical visits, progress notes, medical opinions from multiple medical professionals, test results, prescription history, the course of her symptoms—before reaching a conclusion. Tr. 89–103. In doing so, the ALJ explained why he found inconsistencies in aspects of Garens's statements and testimony and in other evidence. Tr 97–100. And the ALJ evaluated various medical opinions, including those of Nurse Stenger and Counselor Darling-Mellott, and explained why each was or was not persuasive.[8] Tr. 98, 100–03.

Garens hangs her hat on the "consisten[cy]" of the "opinions" offered by Nurse Stenger and Counselor Darling-Mellott "about the severity of [Garens's] limitations." Doc. 7, at 10–11.  She says that "the ALJ's analysis and conclusion that Plaintiff was significantly more functional than these two professionals' opinions lacked the support of substantial evidence." *Id*. at 10. But the ALJ reviewed these opinions, found that neither was persuasive, and explained why neither was persuasive. Tr. 98, 102–03. Garens, however, ignores the fact that the ALJ explained the opinions' unpersuasiveness and—other than saying it—

---

[8]    The ALJ specifically discussed the opinions provided by Nurse Stenger and Counselor Darling-Mellott. Tr. 98, 102–03. Garens relies on these opinions but does nothing to show that the ALJ's erred in evaluating their evidence.

offers no basis to discount the ALJ's analysis. So Garens has forfeited any challenge to the determination that the opinions of Nurse Stenger and Counselor Darling-Mellott were unpersuasive. And that's enough to sink her claim even if she had preserved it.

Given Garens's burden in this Court, absent *any* argument about what might be wrong with the ALJ's exhaustive review of the evidence and his resulting analysis, there is no reason to conclude that the ALJ erred or that his step-five determination is not supported by substantial evidence. The Court should thus affirm the Commissioner's decision.

## Conclusion

For the reasons explained above, I recommend that the Court affirm the Commissioner's decision.

Dated: March 13, 2023

*/s/ James E. Grimes Jr.*
James E. Grimes Jr.
U.S. Magistrate Judge

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen days after the party objecting has been served with a copy of this Report and Recommendation. 28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may forfeit the right to appeal the District Court's order. *See Berkshire v. Beauvais*, 928 F.3d 520, 530–531 (6th Cir. 2019).